IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) No. 09 CR 115 |
| v. | ) |
| | ) Judge Virginia M. Kendall |
| RONALD HADDAD, JR. | ) |

**MEMORANDUM OPINION AND ORDER**

After years of pretrial litigation including numerous competency evaluations, pretrial release revocation hearings, multiple appointed lawyers, and multitudes of pro se filings by the defendant, Ronald Haddad, a jury convicted him of twenty eight counts of mailing threatening communications in violation of 18 U.S.C. § 876(c) (Counts 1-28), and two counts of emailing threatening communications in interstate commerce in violation of 18 U.S.C. § 875(c) (Counts 29-30). (Dkt. No. 75). Haddad now moves for judgment of acquittal under Fed. R. Crim. P. 29, alleging that there was insufficient evidence linking him as the author of the charged letters. Haddad also moves for a new trial under Fed. R. Crim. P. 33, alleging that the Court committed a number of errors. According to Haddad, these errors denied him a fair trial. For the reasons stated herein, the Court denies Haddad's motions.

**I. The Record Contained Sufficient Evidence to Support the Jury's Verdict**

Haddad faces "a nearly insurmountable hurdle" in claiming that the jury had insufficient evidence to identify him as the author of the communications. Fed. R. Crim. P. 29; *see United States v. Tucker*, 737 F.3d 1090, 1092 (7th Cir. 2013) (citing *United States v. Morris*, 576 F.3d 661, 666 (7th Cir. 2009) (quoting *United States v. Pulido*, 69 F.3d 192, 205 (7th Cir. 1995))). The Court now reviews the evidence in the light most favorable to the prosecution and makes all reasonable inferences in the prosecution's favor when reviewing a motion for judgment of

acquittal. *United States v. Hassebrock*, 663 F.3d 906, 918 (7th Cir. 2011). The Court may overturn the jury's guilty verdict "only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *Id.* (quoting *United States v. Huddleston*, 593 F.3d 596, 601 (7th Cir. 2010)). If any rational trier of fact could have found that the defendant committed the essential elements of the crime, then the Court must affirm the conviction. *Hassebrock*, 663 F.3d at 918.

To sustain a conviction for mailing threatening communications, the Government was required to prove that Haddad deposited or caused to be deposited in the mail a communication containing a threat to injure another person; and that he mailed the threat knowingly. *See* 18 U.S.C. § 876(c); *see also United States v. Parr*, 545 F.3d 491 (7th Cir. 2008) (generally discussing crimes of threatening communications). To prove that Haddad transmitted a threat, the Government was required to prove that Haddad transmitted in interstate commerce a communication containing a threat to injure another person; and that he transmitted the threat knowingly. *See* 18 U.S.C. § 875(c); *see also Parr*, 545 F.3d 491. Here, Haddad argues that the Government failed to present sufficient evidence that he was the author of the charged communications or that he sent the communications to the recipients in Counts 1-28. According to Haddad, because there was no forensic evidence of his involvement, the Government failed to meet its burden. Haddad further argues that the evidence failed to support a finding that the emails in Counts 29 and 30 contained true threats as opposed to exaggerated violent imagery.

The evidence presented to the jury to prove that Haddad authored the communications comprised the following. A number of witnesses, including Peter Andrews, Richard Garcia, Bernard Stone, and Erika Lopez, among others, testified that between December 2007 and January 2009, more than two dozen anonymous packages were sent to various elected officials

in Chicago and high-ranking oil executives in Texas and California. Testimony from Peter Andrews, Erika Lopez, Laura Pedro, Chris Coleman, Adrienne Blocker, Richard Garcia, and Agent Sandra Flores established that these mailings were sent to an array of locations, including the office of Alderman Ed Burke, Mayor Daley's office, State Senator Emil Jones's office, John Cullerton's office, the Cook County building, Shell Oil Company, and Chevron Oil Company, respectively. A number of the packages enclosed both a letter and one of the following unknown substances: a white powder, a brown granular powder, or a plastic bag filled with an oily liquid. According to Agent Maureen Mazzola and Terrence Cullivan, another group of packages contained a live shotgun shell attached to a pyrotechnic popper. The letters found in the packages included extreme language. Mazzola testified that the letter sent to the oil companies included a section stating:

> Here is the new situation: We the people are going to stand up to you and fucking kill you. If all went well through the mail, we already killed many of your leaders, hopefully all married and with kids, because we're not going to fall for any society or values bullshit that says we need to be better people by ignoring so-called bigger people like you who attack us…

Mazzola said that other letters inspected throughout the investigation contained similar language. Further, the letters found in the charged communications addressed a number of distinct topics including "80-cent per gallon sugar ethanol fuel" being unavailable in the United States, various political ills in Chicago including patronage hiring and specifically, the conduct of Todd Stroger and Donna Dunnings, wasteful government spending on "public spy cameras," and inordinately high Chicago taxes and parking meter rates.

The Government connected the letters found in the anonymous mailings to Haddad by introducing evidence of personal emails recovered from Haddad's personal email account.

3

Mazzola testified that pursuant to a warrant, the Government recovered four emails found in Haddad's email account from Yahoo! The emails contained strikingly similar language and topic choices to the letters found in the charged communications. Mazzola testified that an identical letter was sent to three oil executives on June 19, 2008: Marvin Odum, John Hofmeister, and Charles James. Both Mazzola and Sandra Jacquez Flores testified that the letter sent to the oil executives stated, in part:

> … as you made sure our politicians ban solar power and the sugar ethanol fuel for 80 cents per gallon at the station … if you and your precious families don't want to die next, and we will so happily and without mercy kill your families … you will bring down the price of gasoline and oil to all-time lows … and allow us to have solar power and 80 cents a gallon at the gas station sugar ethanol fuel just as Germany and Brazil and Spain and many other countries have…

To tie this letter to Haddad, Mazzola told the jury that an email dated July 15, 2008 recovered from Haddad's email account contained the following passage: "Brazil now has and has had for some years 80 cents a gallon at the pump sugar ethanol fuel … Do whatever it takes to knock off and wipe out big oil and force the phase-in of sugar ethanol … death to big oil … and death to their kids too." The July 15, 2008 email also contained the names and addresses of the oil executives who had received the previously mentioned letter. Mazzola stated that similar references to sugar ethanol fuel were found in other emails recovered from Haddad's account dated September 21, 2008 and December 7, 2008.

Mazzola further linked the letters to the unique topics and rants that were also found in emails recovered from Haddad's personal account. Mazzola said that emails recovered from Haddad's account dated January 24, 2008, July 15, 2008, and September 21, 2008, all contained statements demonstrating a strong dissatisfaction with public spy cameras in Chicago. The July

4

15, 2008 email also contained a section dedicated to expressing anger over Todd Stroger's conduct in allegedly lying that a tax hike was needed for a deficit when the money actually went toward giving his cousin, Donna Dunnings, "the biggest Cook County employee raise 12 percent in Cook County history." The email dated December 7, 2008 faulted Mayor Daley for the parking meter rate increase from 25 cents an hour to one dollar per hour citywide, claiming that the profit went to Mayor Daley's nephew, William Daley, Jr., a partner at Morgan Stanley. Mazzola testified that shotgun shell packages were sent to both Donna Dunnings and William Daley, Jr.

Based on this evidence, a reasonable jury could find that Haddad mailed the threatening communications. Although the Government did not present any direct evidence of the crime through a witness personally observing Haddad's conduct, a verdict may be rational even when it relies solely on circumstantial evidence. *See United States v. Jones*, 713 F.3d 336, 340 (7th Cir. 2013); *see also United States v. Gracia*, 272 F.3d 866, 874 (7th Cir. 2001) (circumstantial evidence may be the sole support for a conviction). Per Seventh Circuit Criminal Pattern Jury Instruction 2.03, the Court instructed the jury that they could rely on circumstantial evidence and that the law makes no distinction between direct and circumstantial evidence. Specifically, the Court instructed the jury "to consider both direct and circumstantial evidence. The law does not say that one is better than the other. It is up to you to decide how much weight to give to any evidence, whether direct or circumstantial." The Government presented evidence to the jury linking the unique and inflammatory language and topic choices that law enforcement agents recovered in both the charged communications and Haddad's personal emails. The Government linked each and every communication with a topic or language that marked the singular diction of the author. The numerous distinct topics contained in the letters were universally also located

in the recovered emails. Accordingly, the jury, as the trier of fact, made appropriately reasonable inferences from the evidence presented at trial and that evidence was more than sufficient to make those reasonable inferences. The record contains ample evidence supporting the jury's verdict of guilt based on their decision that Haddad authored the communications.

Haddad alleges that these reasonable inferences cannot support a verdict of guilt beyond a reasonable doubt because the inferences were not supported by any forensic evidence. Haddad argues at length that because the Government presented no fingerprint or DNA evidence attributable to him, it failed to satisfy its burden. This argument fails for two reasons. First, the Government expressly rebutted this theory at trial through presentation of documents found in Haddad's bedroom stressing the importance of avoiding leaving fingerprint or DNA evidence. Mazzola and Agent Bryan Clark testified that during the search of Haddad's home, the search team recovered documents entitled *Ultimate Revenge Techniques for the Master Trickster* and *Vigilante Handbook*. At trial, the Government introduced redacted and limited portions of these books through Mazzola. In total, approximately two pages of text out of 62 were taken from *Ultimate Revenge Techniques* and four pages out of 200 were used from the *Vigilante Handbook*. . Mazzola testified that the *Ultimate Revenge Techniques* excerpt contained "commandments of revenge" including: "Thou shalt not touch revenge documents with thy bare hands. Bare hands leave fingerprints." The *Vigilante Handbook* excerpt contained instructions for sending "warnings" to elicit change. Mazzola also testified that the search team recovered an internet posting from Haddad's bedroom. The posting emphasized the need to take precautions when conducting criminal activity. The posting encouraged readers to cover their tracks by "never leav[ing] spit, blood, sweat, finger, toe, palm, or other prints, never leave hair so if you got your hair cut in the last two days, don't do the job." It was another reasonable conclusion for

the jury to conclude that Haddad abided by these instructional materials recovered from his home and was careful not to leave fingerprint or DNA evidence. Second, in view of the evidence of the many consistencies between the charged communications and the recovered emails from Haddad's account, the Government was not required to present fingerprint or DNA evidence attributable to Haddad. The question for the jury is never what the jury did not hear; but rather, whether the evidence that the jury heard was sufficient to prove the charges beyond a reasonable doubt. *See United States v. Reed*, 744 F.3d 519, 526 (7th Cir. 2014) (reviewing court will overturn a verdict for insufficiency of the evidence only if the record is devoid of evidence from which a rational trier of fact could find guilt beyond a reasonable doubt); *United States v. Westerfield*, 714 F.3d 480, 484 (7th Cir. 2013) (reviewing court examines whether a jury verdict has evidentiary support by asking if there was sufficient evidence to allow a rational trier of fact to find all of the essential elements of an offense beyond a reasonable doubt). Certainly, forensic evidence would have reinforced the conclusion that Haddad authored the letters; but the lack of that evidence, combined with the supporting evidence that Haddad most likely avoided leaving any fingerprints or DNA on the letters due to his self-training based on manuals only fortifies their ultimate conclusion that a common linguistic fingerprint linked him to the communications regardless of the lack of more sophisticated evidence.

Further, the jury heard more than sufficient evidence supporting the conclusion that the communications charged in Counts 29 and 30 contained true threats. The question of whether a statement qualifies as a true threat is ultimately for the jury. *Parr*, 545 F.3d at 497; *United States v. Saunders*, 166 F.3d 907, 912 (7th Cir. 1999). Over the Government's objection, the Court instructed the jury that in order to deem a statement a threat, the jury must conclude not only that a reasonable person would understand the statement as a threat, but also that the speaker of the

7

statement intended it as a threat. The Government sought exclusion of the subjective intent element, arguing that the objectively reasonable person standard should apply. After extensive discussion, however, the Court included the speaker's subjective intent requirement, thereby heightening the standard the jury had to meet in order to find Haddad guilty. The instruction provided to the jury giving the definition of a true threat was as follows:

> A threat is a serious statement or message expressing an intention to inflict bodily injury at once or in the future, as distinguished from idle or careless talk, exaggeration, or something said in a joking manner. A statement or message is a threat if it was made under such circumstances that a reasonable person reading the statement would understand it as a serious expression of intent to inflict bodily injury and the speaker intended it as a threat. A threat can be either implicit or explicit.

In convicting Haddad, the jury found that Haddad's statements were true threats based on the preceding definition, and this Court can acquit Haddad only if he shows that there was no evidence to support the conclusion. *See Parr*, 545 F.3d at 497. The jury heard the testimony of Greg Sutor, who was the recipient of Haddad's emails comprising Counts 29 and 30. He testified that the emails discussed a big oil conspiracy while simultaneously addressing several political figures[1]. According to Sutor, the emails contained serious threatening language against a number of oil CEOs, political figures, and River Forest police officers. Sutor testified that regarding the oil individuals, the email contained a passage stating that the CEOs:

> "did not bank on my making 100 percent justified murder targets out of their families … and [they] thought I faded away and … would [not] do what I am doing now, publicizing their most important vitals and telling you that … perhaps knifing one of their small children to the wall 100 percent justified and wonderfully bloody home invasion style will make big oil get the message…"

---
[1] The emails also reference 80 cents a gallon at the pump sugar ethanol fuel, Mayor Daley, Todd Stroger, Donna Dunnings, and Chicago parking meter rates, providing another connection to the communications found in Counts 1-28.

Sutor became particularly concerned when he realized the emails contained home addresses for the individuals discussed. In the emails, Haddad stated repeatedly and consistently that he was making targets out of the mentioned individuals by providing their personal information and home addresses. He provided the addresses of former Governor Rod Blagojevich, various oil CEOs, and three current and former River Forest police officers. Haddad also gave detailed physical descriptions of the police officers while stating that one of them, specifically, "should be yanked out of his car and beaten and kicked right through the concrete." An anonymous letter with personal identifiers, personal descriptions, and direct, concrete statements of harm to be inflicted upon those individuals cannot be deemed joking or hyperbolic without some context to change the violent nature of the image. *See, e.g., Watts v. United States*, 394 U.S. 705, 707-08 (1969) (comments at political rally were political hyperbole, not true threats, especially because crowd laughed at the remarks and the speaker expressly conditioned the threat on an event that he vowed would never occur).

While Haddad gave no precise time for carrying out any actions and did not relay the threats directly to his intended victims, neither was necessary for the jury to find that the emails were true threats. *See Parr*, 545 F.3d at 497 (threat does not need to be communicated directly to its victim or specify when it will be carried out). Haddad claims that the emails contained merely exaggerated violent imagery intended to bring attention to various political and economic complaints, but Sutor testified that the emails seriously concerned him. The jury was entitled to agree. Because there is sufficient evidence to support the jury's findings with respect to both Haddad's mailing threatening communications and transmitting in interstate commerce threatening communications, the Court denies Haddad's motion for judgment of acquittal.

## II. The Interests of Justice Do Not Require a New Trial Because The Court Did Not Err

A court may vacate a judgment and grant a new trial where the interests of justice so require. Fed. R. Crim. P. 33(a). "A defendant is entitled to a new trial if there is a reasonable possibility that a trial error had a prejudicial effect upon the jury's verdict." *United States v. Van Eyl*, 468 F.3d 428, 436 (7th Cir. 2006). However, a jury verdict in a criminal case is not to be overturned lightly, and accordingly, a Rule 33 motion will not be granted lightly. *See United States v. Santos*, 20 F.3d 280, 285 (7th Cir. 1994) (citation omitted).

Haddad alleges that the Court committed numerous errors during the course of his trial and therefore he is entitled to a new trial. As a preliminary matter, the Court notes that many of Haddad's arguments are either presented in a cursory and unelaborated fashion with no support for his position or are merely duplicates of previous arguments. Undeveloped and merely perfunctory arguments may result in dismissal outright. *See Hassebrock*, 663 F.3d at 914; *United States v. Turcotte*, 405 F.3d 515, 536 (7th Cir. 2005). Nevertheless, the Court will briefly address each argument. Secondarily, throughout the course of this case, Haddad has made numerous allegations against the Court even up to the first day of trial when he informed the Court that he had filed yet another civil case against her and another judicial misconduct complaint against her. Ironically, Haddad told the Court that he regretted the filings during the jury selection process because it had gone more smoothly than he had thought it would. Specifically, Haddad informed the Court that "out of an earlier phase of frustration, [he] had filed an ARDC complaint and a lawsuit" that involved both the Court and the prosecutors. Haddad further stated that "things have obviously gotten more diplomatic and pleasant … than [he] expected … and if [he] had known that these changes would occur, [he] probably would not have filed that litigation when [he] did or how [he] did."

### A. Motions to Dismiss

Haddad first contends that the Court erred in failing to grant his motions to dismiss the indictment based on the unconstitutionality of 18 U.S.C. § 875(c) and § 876(c). This argument was heavily litigated before trial, and Haddad offers no new support for his position that the charged statutes are unconstitutional. As this Court previously stated, the statutes under which Haddad was charged prohibit only true threats, as opposed to political hyperbole. *See Watts*, 394 U.S. at 708. Because true threats always fall outside the ambit of First Amendment protections, *see R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992), the statutes do not chill constitutionally protected speech. The jury was instructed properly on that standard and reached the conclusion that the communications were true threats.

Additionally, the thrust of Haddad's argument in his motions to dismiss was that without an element of subjective intent to threaten on behalf of the sender of the communications, the statutes are overbroad. But Haddad received the benefit of this additional element at trial. The instruction provided to the jury giving the definition of a true threat was:

> A threat is a serious statement or message expressing an intention to inflict bodily injury at once or in the future, as distinguished from idle or careless talk, exaggeration, or something said in a joking manner. A statement or message is a threat if it was made under such circumstances that a reasonable person reading the statement would understand it as a serious expression of intent to inflict bodily injury **and the speaker intended it as a threat**. A threat can be either implicit or explicit (emphasis added).

As discussed above, over objection by the Government, the Court gave Haddad the benefit of requiring the jury to find that Haddad subjectively intended the communications as threats. *See Parr*, 545 F.3d at 500 (without expressly ruling, finding it likely "that an entirely objective

definition" of a true threat was no longer tenable). This decision appears to be in accord with at least some of the justices who recently heard oral argument in *Elonis v. United States*, who expressed concern about the proposition that an online post should be considered threatening if that was not the author's intention. *See* Transcript of Oral Argument, *Elonis*, No. 13-983, *available at* http://www.supremecourt.gov/oral_arguments/argument_transcripts/13-983_bq7d.pdf. Therefore, the jury could only convict Haddad if it found that he subjectively intended the charged statements as threats. His current argument is accordingly moot.

### B. Emails Constituting Counts 29 and 30

Haddad merely repeats the contention found in his motion for a judgment of acquittal that the email communications making up Counts 29 and 30 contained exaggerated violent imagery as opposed to true threats. As stated above, the question of whether the statements constituting Counts 29 and 30 were true threats was for the jury and there was sufficient evidence for the jury to conclude that they were.

### C. Bill of Particulars

Again, Haddad disputes a pretrial ruling without providing any new support for his position. Haddad asserts that the Court erred in failing to grant his motion for a bill of particulars when the indictment simply tracked the statutory language of the charged offenses. As explained in the Court's prior ruling, a bill of particulars is unnecessary where the indictment sets forth the elements of the charged offenses and provides information relevant to the preparation of a defense including the time and place of the accused's allegedly criminal conduct and a citation to the statute or statutes violated. *See United States v. Hernandez*, 330 F.3d 964, 975 (7th Cir. 2003); *United States v. Fassnacht*, 332 F.3d 440, 446 (7th Cir. 2003).

A bill of particulars was unnecessary here because the indictment charging Haddad included the elements of each charged offense, the date and location of the alleged criminal conduct, and a citation to the statutes involved. Additionally, Haddad received extensive pretrial discovery including copies of all of the communications. *See Hernandez*, 330 F.3d at 975 (bill of particulars unnecessary even where indictment fails to provide necessary information when information is available through discovery). Haddad received copies of the charged communications, the results of forensic testing done on the documents, reports memorializing interviews with many of the recipients of the communications, and a chart identifying by name the victims named in the indictment. Haddad was sufficiently apprised of the charges against him such that he could prepare a defense. *See Fassnacht*, 332 F.3d at 446 (defendant's constitutional right is to know what offense he is charged with, not how it will be proved). Therefore, the Court denies this basis for a new trial.

**D. Motions in Limine Regarding Writings Found in Haddad's Home**

Next, Haddad asserts that the Court erred in failing to exclude reading materials and writings found in Haddad's home, including (1) excerpts from the *Vigilante Handbook*, (2) excerpts from *Ultimate Revenge Techniques*, (3) "Renegade" postings, (4) a Dominican University transcript, (5) a letter written by Haddad to Whole Foods, and (6) personal emails recovered from Haddad's email account. The documents were the subject of a motion in limine presented by Haddad prior to trial which was appropriately denied by the Court.

Regarding the *Vigilante Handbook*, *Ultimate Revenge Techniques*, and the "Renegade" postings, all three documents describe a number of strategies and tactics to avoid leaving fingerprints and DNA evidence. The documents were all recovered from Haddad's bedroom.

Books, periodicals, and reading materials discussing how to commit and get away with a crime, found in a defendant's possession, are admissible at trial. *See, e.g., Parr*, 545 F.3d at 502 (where the defendant was charged with threatening to use a weapon of mass destruction, sections of his copy of *The Anarchist Cookbook* dealing with homemade explosives were admissible); *United States v. Rogers*, 270 F.3d 1076, 1080-81 (7th Cir. 2001) (*The Anarchist Cookbook* found in the defendant's possession was properly introduced at trial); *United States v. Murphy*, 518 F. A'ppx 396, 403 (6th Cir. 2013) (admission of book titled *Master Thief: How to Be a Professional Burglar*, found in the defendant's possession, had probative value because it recommended that readers follow substantially the same steps the defendant took). The Court's previous ruling is bolstered by the fact that Haddad's main defense theory at trial was that the Government was unable to produce any fingerprint or DNA evidence linking Haddad to the charged communications. The documents therefore became all the more relevant because they refuted that defense. Importantly, the excerpts introduced from the *Vigilante Handbook* and *Ultimate Revenge Techniques* were limited to the relevant sections discussing avoiding leaving evidence and successfully sending "warning letters." *See Parr*, 545 F.3d at 502 (proper way to introduce reading materials found in a defendant's possession is to limit to pertinent portions). Here, approximately four pages out of 200 were used from the *Vigilante Handbook* and two pages of text out of 62 were taken from *Ultimate Revenge Techniques*. The introduction of this evidence provides no basis for a new trial.

Nor was introduction of Haddad's Dominican University transcript an error. The "Renegade" postings detailing how to avoid leaving forensic evidence were created in an internet chat room from a Dominican University internet domain while Haddad was a student at Dominican University. As stated on the record in open court, the transcript is therefore relevant

14

because it links Haddad to the location where the postings originated. The Dominican University link to Haddad was a critical piece of proof linking Haddad to the communications. The relevance bar is not a difficult standard to satisfy. *See United States v. McKibbins*, 656 F.3d 707, 711 (7th Cir. 2011) (the rules of evidence define relevance broadly as evidence "having any tendency to make the existence of any fact…more probable or less probable"). Introduction of the transcript made it more likely, however slightly, that Haddad was the author of the "Renegade" postings, and it was not an impermissible inference for the jury to make.

Additionally, the Court did not err in admitting the letter to Whole Foods or the emails recovered from Haddad's email account. As stated in the Court's previous rulings and on the record, both the recovered emails and the Whole Foods letter use the same identifying marks and diction found within the charged communications. The emails and the charged communications contain the exact same language at points and the same topic choices throughout. Additionally, the dates of the recovered emails place them directly in the middle of the charged conduct. The emails and the Whole Foods letter, at a minimum, are relevant to prove that the identity of Haddad as the author of the emails and letter is the same as the sender of the charged communications. Identity was the main issue at trial, and the language and topic selection found in the recovered emails and the Whole Foods letter provided the most compelling, relevant evidence of a connection between Haddad and the charged communications. Accordingly, their admission was proper.

**E. Government's Motions in Limine**

Haddad argues that the Court erred in granting the Government's motions in limine to exclude (1) evidence about Haddad's lack of intent to carry out any charged threats, (2)

15

argument or evidence with respect to Haddad's right to freedom of expression under the First Amendment, (3) reference to whether other individuals have been prosecuted for making threats, and (d) evidence of Haddad's lawful conduct. Haddad offers no rationale or support for his conclusion that the Court's rulings were incorrect. Therefore, his arguments may be deemed waived. *See Turcotte*, 405 F.3d at 536. However, the Court will briefly summarize its prior rulings on the raised topics.

A defendant's intent to follow through with a threat is irrelevant to a threat case. *See Parr*, 545 F.3d at 498 ("It is well-established that the government is not required to prove that the defendant in a threat case intended or was able to *carry out* his threats."). Any discussion of the First Amendment or the freedom of speech would have served only to confuse the jury because a true threat is categorically unprotected language. *See United States v. White*, 610 F.3d 956, 959 (7th Cir. 2010) (potential First Amendment concerns involving threatening language are addressed by the requirement of proof beyond a reasonable doubt at trial). Any reference to whether others have been prosecuted for making threats could amount only to an irrelevant selective prosecution or prosecutorial discretion challenge. *See United States v. Moore*, 543 F.3d 891, 899 (7th Cir. 2008) (in the ordinary case, so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute rests entirely in his or her discretion). An exercise of prosecutorial discretion cannot be successfully challenged solely on the grounds that it is irrational or arbitrary; only invidious discrimination is forbidden. *See United States v. Smith*, 502 F.3d 680, 691 (7th Cir. 2007). Finally, evidence that a defendant acted lawfully on other occasions is generally inadmissible to prove he acted lawfully on the occasion alleged in the indictment. *United States v. Reese*, 666 F.3d 1007, 1020 (7th Cir. 2012).

**F. Refusal to Appoint Attorney on the Eve of Trial**

Finally, Haddad contends that the Court erred in refusing to appoint him a lawyer when he intimated that he wanted to terminate the representation of his counsel on the eve of trial. Haddad argues that requiring him to choose between representing himself and proceeding to trial with a lawyer he did not want violated his right to due process and denied him his right to be assisted by counsel.

Haddad's struggles with his appointed and retained counsels are well-documented. Including his trial attorney, Haddad was represented by five different attorneys, three of whom were appointed by the Court. Despite numerous warnings by the Court that no new attorneys would be appointed in the event Haddad became dissatisfied with his trial attorney, on the eve of trial, Haddad informed the Court that he desired the appointment of a new attorney to represent him. The Court correctly refused. *See United States v. Oreye*, 263 F.3d 669, 670 (7th Cir. 2001) ("Given the fact that an indigent defendant has a right to competent counsel but not a right to counsel of his choice, the judge was fully within his rights in refusing to appoint a third lawyer…") (citations omitted). Here, the Court appointed three lawyers and Haddad retained two more. All of these lawyers either requested to withdraw because of Haddad's lack of cooperation or were discharged by Haddad, *see* Dkts. 54, 95, 209, 260, and the Court advised Haddad of the difficulties and dangers of proceeding without the assistance of counsel. The Court explicitly warned Haddad that if he represented himself, he would be faced with complicated issues in the courtroom. He was instructed that he would have to follow the rules of the courtroom. Haddad's issues with representation were caused by his own refusal to cooperate, and the Court appropriately refused to delay trial any further. After concluding that Haddad had constructively discharged his counsel by refusing to cooperate with her and take her legal advice, the Court

informed Haddad that he would not be given another appointed attorney. The Court, however, recruited his counsel, Andrea Gambino, who had worked with him up until the eve of trial, as his standby counsel. Gambino was with him during the first few hours of jury selection during which time she consulted with him and he asked her questions. Meanwhile, Haddad himself questioned jurors and actively participated in the jury selection process. At the end of this first day, Haddad chose to proceed with Gambino as his lawyer. She acted as trial counsel from that point forward, presenting an opening statement, cross examining all witnesses, and arguing the case to the jury. Haddad has repeatedly manipulated the judicial process through his constant belligerence with retained and appointed lawyers which had delayed this case for years. He was more than adequately represented at trial by an attorney who had worked on the case for months, sought extra time to prepare for trial (which she received), filed numerous motions, argued all motions and pretrial matters at the pretrial conference and represented him at trial. Haddad's motion regarding his lack of counsel is frivolous and therefore denied.

## **CONCLUSION**

For these reasons, Haddad's motions are denied.

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: 1/13/2015